# WINSLOW *v.* BALTIMORE AND OHIO RAILROAD COMPANY.

## APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 125. Argued December 17, 18, 1902.—Decided February 23, 1903.

A lease containing a covenant to renew at its expiration with covenants, terms and conditions similar to those contained in the original lease, is fully carried out by one renewal without the insertion of another covenant to renew. Otherwise a perpetuity is provided for, and this the court will not presume in the absence of plain and peculiar language.

Where land is owned by three trustees under a trust requiring an exercise of the judgment and discretion of all the trustees and there is no evidence of authority for one of them to act alone, the execution of what purports to be a lease for five years by one of the trustees does not make a valid lease of the property, nor does it affect the share of the trustee executing it as in the case of ordinary joint tenants; and where all the trustees do not join in the execution of an instrument, the burden is on the grantee to prove the deaths of those not joining therein. Recognition or ratification by the other trustees cannot be assumed unless it is shown to have been founded upon full knowledge of all the facts.

The receipt of rent by the beneficiary under the trust directly from the tenant will not amount to a part performance of the contract in such manner as to make it binding upon the trustees not signing when it appears that the check received for such rent was not endorsed by the trus-

tee and there is no proof that the beneficiary knew there was no binding lease in existence, but it does appear that subsequently rent was refused and only accepted under an agreement that the acceptance was without prejudice.

Where a lease contains an option to the lessee to purchase at a price named in the lease during the continuance thereof and the trustees making the lease have no general or absolute power of sale, specific performance of that portion of the contract should be denied.

Where a railroad company has built its line on land affected by such a lease, and the trustees have commenced an action to recover rent for the period of occupancy subsequent to the expiration of the lease, and also to recover possession of the property, there is no ground for an injunction against the prosecution of the action as to the recovery of the rent; it is proper, however, for this court to enjoin for a reasonable period, in order to permit condemnation proceedings to be instituted and prosecuted, that portion of the action which is an attempt to oust the railroad company from land upon which it has entered with a view to its purchase and constructed its road thereon for public purposes under the sanction of public authority and over which the public have rights which should not be obstructed or destroyed either by the company itself or by antagonistic parties claiming ownership as a result of a private agreement.

THE Court of Appeals of the District of Columbia, reversing the judgment of the Supreme Court of the District, (which dismissed the bill of the railroad company,) directed that court to give judgment in favor of the company, and from the judgment of the Court of Appeals an appeal to this court has been taken by the defendants below.

The company brought this suit to obtain a judgment declaring the validity of an alleged lease to it for five years from the first day of August, 1897, and to compel the specific performance of an alleged contract to sell to it the same land mentioned in the lease and lying in the city of Washington, owned by the defendants as substituted trustees under the will of the late Catherine Pearson, deceased, and to enjoin the defendants from continuing proceedings at law which they had commenced to obtain possession of the premises, and also to enjoin them from the prosecution of an action to recover damages for the use and occupation of the land by the railroad company. The facts are as follows:

Catherine Pearson in her lifetime owned certain land, consisting of unimproved lots in the city of Washington, near the Baltimore and Ohio Railroad Company's depot, and lying on the line of its Metropolitan branch as subsequently constructed in that city. After the decease of Mrs. Pearson, and on June 30, 1868, her will was duly proved before the proper probate court in the District. In it she devised the premises to trustees for the sole and separate use of her daughter, Eliza W. Patterson—

" During the term of her natural life, and so that the same shall not be liable for the debts or subject to the control, contracts or engagements of her present or any after-taken husband; to permit her by herself, or her special attorney appointed in writing, to be signed by her, to receive the annual income and profits of the same for her own sole and separate use, her receipt or that of her attorney so appointed as aforesaid alone to be an acquittance to the person or persons charged with the payment of such income or any part of the same, and to the extent only therein expressed to have been paid—and if she please to occupy, possess and use for her own account, accommodation and convenience and that of her family any part of the property, real and personal, so held for her separate use and benefit, she shall be allowed to do so; and if at any time the said Eliza Patterson shall in writing, to be signed by her in the presence of and to be attested by a subscribing witness, desire the said Carlisle P. Patterson, William H. Philip and Walter S. Cox, or the survivors and survivor of them, to sell any part of the estate, real and personal, held by them for her separate use, for the purpose of changing the investment thereof, it shall be lawful for the said named trustees or the survivors or survivor of them to sell the same for such purpose only, and to transfer and convey the absolute estate in fee therein, to the purchaser thereof; to receive the proceeds of any and every such sale of the purchaser, who shall not be required to see to the application thereof; and to invest the same in such manner as the said Eliza W. Patterson may require; and such new investment shall be held by the said trustees for the same use, trusts and purposes, and with the

same powers and authority of sale and reinvestment as is herein declared of and concerning the original trust, subject and separate estate.

"And after the death of the said Eliza W. Patterson the said named trustees and their successors shall hold the said trust, subject and separate estate—original and subsequently acquired by sale and reinvestment—for the use and benefit of any child, or children, of the said Eliza W. Patterson, and the issue of any child or children of the said Eliza who may die leaving issue in the lifetime of the said Eliza, and such issue shall take the share or portion of the said estate which their parent or parents would have taken had they survived the said Eliza. And if the said Eliza W. Patterson shall die without leaving a child or children, or issue of any child or children, living at the time of her death, the said trustees and their successors shall hold the said trust, subject and separate estate for my right heirs. And if it shall happen that either of the said trustees shall die, or become incapable of acting, or shall refuse to act in the execution of said trust, then and in every such case the continuing trustees or trustee shall from time to time nominate some other person or persons to be approved by the said Eliza W. Patterson to be trustee or trustees in the place and stead of the person or persons so dying, or becoming incapable or refusing to act, and shall convey and settle the said trust, subject and separate estate in such manner, that the same shall be legally vested in such continuing trustees or trustee, and such person or persons so named and appointed to that office for the same uses, trusts and purposes, and with the same power and authority of administration, sale and reinvestment as is hereinbefore declared of and concerning the said trusts, subject and estate, and the said new trustee or trustees shall have the same power to act in the premises in conjunction with the continuing trustee or trustees, and as survivors of them, as if they had been originally named trustee or trustees in the premises in this my last will and testament.

"I do hereby nominate and appoint Carlisle P. Patterson, William H. Philip and W. S. Cox to be the executors of this my last will and testament."

In 1872 the trustees under Mrs. Pearson's will leased to the railroad company the land for five years, the lease containing a privilege to the railroad company to purchase such land during those five years on payment of $12,592. It also contained an agreement to renew the lease with the same covenants and privileges for another term of five years, or until the lessors were prepared to convey the premises as agreed in the lease with a perfect title in fee simple.

From the time of the first lease in 1872, and under various leases thereafter, the company occupied the land, constructed part of its branch line thereon, and paid rent therefor up to 1888. On January 30 of that year a lease was made, which was signed by the trustees and by the president of the railroad company, though not by Mrs. Patterson. By the terms of that lease the premises were rented for five years from August 1, 1887, at the same rent and with the same covenants as to renewal and for the sale of the lands as contained in the first lease of 1872. The company continued in the occupation of the premises under this lease for the five years mentioned therein. Upon October 17, 1892, the company still being in occupation of the land, another instrument was executed in the form of a lease, signed by but one of the trustees, and purporting to lease the land for five years from August 1, 1892, at the same rental as the lease of 1888, and with the same covenants to sell at the same price ($12,592,) and to renew the lease for five years, as contained in the lease of 1888. This lease was signed by Winslow, alone, he then being one of the substituted trustees, but Jay, another of the substituted trustees, did not sign it, and, so far as appears, never saw it. These two substituted trustees had been duly appointed prior to or in the year 1883. The former trustee, Judge Cox, had resigned in June, 1892, and it does not appear that his successor had then been appointed.

The company retained possession of the property from August 1, 1892, up to August 1, 1897, and paid the amount of money mentioned in the paper of 1892, being at the same rate that had been paid since 1872, and as was provided in the lease of 1888. About the first of August, 1897, questions arose as to the terms of future occupation of the land. The trustees re-

fused to execute any further lease, denied any obligation to renew it for any term, and said they preferred to sell, but refused to do so on the old terms, the land having in the meantime largely appreciated in value.  In September, 1897, Mr. Winslow, in a letter to the company, said they were prepared to convey the property with a perfect title, and that they also preferred to execute such conveyance to any renewal of the lease.  The company, however, prepared a lease, which provided for again leasing the land to it on the same terms for a period of five years, commencing on August 1, 1897, and this lease also contained a provision for a renewal for another five years, or until the lessors could convey the premises in fee simple to the company.  This lease was never signed.  Negotiations continued in regard to the matter, the company insisting it had the right to a renewal of the lease by virtue of the instrument dated August 1, 1892, while the trustees denied that contention, and though willing to sell, were not willing to do so at the price named in the former lease, as they said that the value of the land had increased from $12,592 to over $30,000.  During these negotiations and disputes the company retained possession of the land, and on or about February 1, 1898, (the dispute and the negotiations between the trustees and the company being still unsettled,) in accordance with the custom which it had followed during the running of the various instruments since 1872, of paying the rent semi-annually on the first days of February and August as it accrued, it sent the money that would have been due for rent, (if a lease were then in existence,) in the form of a money order payable to the order of Mr. Winslow, trustee of Eliza W. Patterson, and enclosed it in a letter addressed to Mr. Winslow, in care of Fisher & Co., agents, who sent it to Mrs. Patterson, as Mr. Winslow was then absent in Nicaragua as secretary of the Canal Commission.  This money order was received by Mrs. Patterson, who thereupon wrote the following letter, under date of February 5, 1898, to one of the officers of the company :

"DEAR SIR: I returned to you a few days ago the draft which you sent me for the rent of my property on First street,

Washington, by the railroad company of Balto. & Ohio of $377.77. The draft was made out to Mr. Francis Winslow, trustee, and I could not draw it, as Mr. Winslow in Nicaragua, and I could not send it so far away to him, fearing it might be lost. I therefore return it to you, with the request that you would sign it, as you always have done heretofore, Cox, Jay & Winslow, trustees. Judge Cox & Mr. Jay are both here, so that they can sign it at once and I can have the money. By giving prompt attention to this small matter of business you will greatly oblige,

"ELIZA W. PATTERSON."

The statement in this letter, that Judge Cox could sign the draft or order, was evidently a mistake, as his resignation had been accepted by the court years prior to the date of the letter.

The company afterwards sent back the draft, and, under some arrangement between Mrs. Patterson and Fisher & Co., which it does not appear was known by the trustees, but which was consented to by the company, the same was endorsed "Francis Winslow, trustee, by Thomas J. Fisher & Co., attorneys," and on such endorsement the money on the voucher was obtained from the company and received by Mrs. Patterson.

On August 1, 1898, the company sent a draft or money order for $377.77, the amount of rent which would have been due if there had been a valid lease in existence, the draft being sent to Mr. Winslow, trustee, which he declined to negotiate, and insisted that the rights of the company had been terminated by his notice prior to and in September, 1897, and that since that time the company had been occupying the property as tenants by sufferance.

This voucher, and those which succeeded it, and which were forwarded to Mr. Winslow, as trustee, and made payable to his order, were retained by him until January, 1900, when they were returned to the company and a check given for the aggregate amount under an agreement that its acceptance should be without prejudice to the rights of the respective parties and their claims relating to he leasing of the land or

the renewal of the lease, or to any question or matter connected therewith.

The dispute between the parties continued, as also did the negotiations in regard to a settlement thereof, until some time in March, 1900, when Mr. Winslow, Mr. Jay and the American Security and Trust Company, the substituted trustees, took proceedings against the company before a justice of the peace to obtain possession of the premises, based upon a notice to quit, given under the statute. Judgment in favor of the trustees was rendered in that case by default, and an appeal by the company, as provided for by law, was prosecuted, and was undetermined at the time of the commencement of this suit. On August 15, 1900, the substituted trustees also commenced an action against the company for the use and occupation of the premises from August 1, 1897, to April 16, 1900, claiming $6500, with interest from the last-named date. Soon thereafter the company commenced this suit asking for a judgment that the company was entitled to a lease from August 1, 1897, for five years, and also for a judgment for specific performance of the contract to sell, and obtained an injunction restraining the prosecution of both of the proceedings above mentioned.

The trial court held that there had been no valid contract for a sale, and that there was then no valid lease in existence such as was required to be proved before a court of equity would decree specific performance. The court expressed no opinion as to the effect of continued occupation after the expiration of any lease under the facts in the case with reference to the amount of the rental to be paid. That was a matter which it was held could be determined on the law side of the court. A decree was therefore entered dismissing the bill, and dissolving the injunction which had been granted.

The Court of Appeals reversed the judgment of the trial court, 18 App. D. C. 438, and remanded the case, and in its opinion it was stated as follows:

"In view of what has been said, we are of opinion that, under the provisions of the lease of 1892, executed by Francis Winslow, trustee, for and on behalf of the life tenant, Mrs. Eliza W. Patterson, the appellant was and is entitled to one

renewal of such lease for the term of five years from and after the first day of August, 1897, upon the terms and conditions of said lease as to the rents to be paid therefor; and that during the continuance of such term no suit for the dispossession of the appellant can be maintained. We are, also, of opinion that, for the time subsequent to the determination of said renewed lease for which the appellant shall require the use and occupation of said land, the appellant is entitled, and it is its duty to acquire the right to such use and occupation, under the exercise of the right of eminent domain conferred upon it by the act of Congress, by the ascertainment of the value of such use and occupation, and payment to the owners of the land of the just compensation so to be ascertained. And the bill of complaint in this cause may be retained for the purpose of such ascertainment of value and just compensation. It follows that the decree of the Supreme Court of the District of Columbia dissolving the injunction granted in this cause and dismissing the bill of complaint, must be reversed, with costs; and that the cause will be remanded to that court, with directions to vacate said decree, to restore the injunction and make the same perpetual, and for such further and other proceedings as may be just and proper, according to law and in conformity with this opinion. And it is so ordered."

*Mr. William G. Johnson* for appellants.

*Mr. M. J. Colbert* and *Mr. George E. Hamilton* for appellee.

MR. JUSTICE PECKHAM, after making the foregoing statement of facts, delivered the opinion of the court.

It is quite plain that a lease containing a covenant to renew at its expiration with similar covenants, terms and conditions contained in the original lease is fully carried out by one renewal without the insertion of another covenant to renew. Otherwise a perpetuity is provided for. *Piggot* v. *Mason*, (1829) 1 Paige's Ch. 412; *Carr* v. *Ellison*, (1838) 20 Wend. 178;

*Syms* v. *Mayor*, (1887) 105 N. Y. 153 ; *Cunningham* v. *Pattee*, (1868) 99 Massachusetts, 248 ; Taylor's Landlord & Tenant, 8th ed. §§ 333, 334.

From the ordinary covenant to renew, a perpetuity will not be regarded as created.   There must be some peculiar and plain language before it will be assumed that the parties intended to create it.

There is no question of the validity of the lease of 1888.   It was for five years from the first of August of the year 1887, with a covenant of renewal, and that covenant would have been satisfied by giving a lease in 1892 for five years, up to August, 1897, without any covenant therein for a further renewal.   In fact, however, the lease was not legally renewed in 1892, because the paper of that year was signed by one trustee only. In our opinion his signature did not make a valid lease.   It required the signatures of all the trustees.   A deed of land executed by one trustee does not convey his share as in the case of ordinary joint tenants.   So where a deed of land was executed by two out of three trustees, the burden is upon the purchaser to prove the third trustee was dead.   1 Perry on Trusts, (2d ed.), sec. 411 ; 2 Perry on Trusts, secs. 499, 502 ; 2 Story Eq. Juris. (12th ed.) sec. 1280 ; *Brennan* v. *Willson*, 71 N. Y. 502–507.

The authorities cited by the counsel for the company, to the effect that one of several trustees may, when so authorized by his associates, act with regard to the execution of some portions of the trust, as their agent, and that when not previously so authorized a subsequent ratification of his act by his associates may bind them all, do not embrace the facts in this case.   There is no evidence of any authority to one trustee to sign a lease. The granting of a lease was an important and material act in the way of carrying out the trust under the will, requiring an exercise of the judgment and discretion of all the trustees.   It was therefore necessary for them all to act in order to make a valid instrument.

That one of several trustees can be entrusted by his associates with the transaction of the business of the trust may be, under certain circumstances, conceded, but those circumstances will not justify the doing of an act by one trustee on

his own responsibility which is of a nature to require the deliberate discretion and judgment of all the trustees. In the case of a lease of property, such as is presented herein, the signatures of all are necessary to the validity of the paper.

The case cited of *Insurance Company* v. *Chase*, 5 Wall. 509, relates to an insurance effected by one of several trustees, and the question was whether the policy covered the individual interest of the person taking out the insurance or his interest as a trustee; if the former, it was void because he had no interest as an individual, and the policy was therefore one in the nature of a wager. The court in the course of the opinion remarked: "It is true, that in the administration of the trust, where there is more than one trustee, all must concur, but the entire body can direct one of their number to transact business, which it may be inconvenient for the others to perform, and the acts of the one thus authorized, are the acts of all, and binding on all. The trustee thus acting is to be considered the agent of all the trustees, and not as an individual trustee. If, within the scope of his agency, he procures an insurance, it is for the other trustees, as well as himself. If he does it without authority, still it is a valid contract, which the underwriter cannot dispute, if his co-trustees subsequently ratify it. In fact, so liberal is the rule on this subject, that where a part owner of property effects an insurance for himself and others, without previous authority, the act is sufficiently ratified, where suit is brought on the policy in their names."

The facts in this case do not bring it within the principle mentioned, and it is clear that to render the lease originally valid it must have been signed by all the trustees. Without it the instrument as a lease for five years was void under the statute of frauds. Comp. Stat. D. C. 231, sec. 4.

It is contended that the act of one of the trustees in signing the lease was subsequently ratified by the other by a recognition of its existence by long continued silence, if not by an express ratification. But an express ratification would consist of the signature of the other trustee to the paper, and of that there is no pretense. A ratification of an invalid instrument of this nature by recognition, we do not understand. The instrument

was void under the statute of frauds, because of the lack of those signatures which could alone render it valid as a lease for five years. Recognition could not take the place of the absent signature. Whether the conduct of the trustees, or of Mrs. Patterson, amounted to such a part performance of an invalid contract as would take the place of the otherwise necessary signatures is another question. It is difficult to see how there could be any technical ratification of this instrument without a signing thereof by the other trustee.

But assuming that something in the nature of a ratification might be based upon subsequent recognition, yet such recognition or ratification must be shown to have been founded upon a full knowledge of all the facts. There is no evidence of that kind in the case; none that the other trustee even knew of the existence either of the written paper of 1892 or that it contained a covenant to renew at all for any time. The possession by the company and the payment of rent were provided for by the covenant to renew contained in the lease of 1888, and hence there was a justification for that possession and for the payment of the money, which was entirely compatible with the non-existence of any written lease from 1892, or of any covenant to again renew for five years from August 1, 1897. This possession and payment cannot therefore be used as a basis for the presumption of knowledge on the part of the trustee of the existence of the so-called lease of 1892 or of the covenant contained therein.

Regarding the asserted part performance of the alleged contract of lease in 1892, or of the covenant contained in that lease, we think there was none such as to justify the contention that the covenant to renew in 1897 for five years was thereby so far rendered valid as to call for its recognition and enforcement. In this case there was reason, as we have said, without reference to any assumed part performance of, and aside from the alleged covenants in, the paper of 1892, for the possession by the company and for the taking of the rent of the land by the trustees up to 1897. This reason was based upon the obligation which existed under the valid lease of 1888. The remaining in possession from 1892 to 1897 and the payment of the money

need not, therefore, be referred to as a part performance of the invalid contract of lease and renewal contained in the paper of 1892. Without any reference to any paper of that character, possession and payment of rent were proper and amounted to nothing more than an acknowledgment of the obligations provided for in the before mentioned lease of 1888.

Acts of part performance which will take a case out of the statute must be referable solely to the contract. *Williams* v. *Morris*, 95 U. S. 444, 457; *Phillips* v. *Thompson*, 1 Johns. Chy. 131; *Byrne* v. *Romaine*, 2 Edwards Chy. 445; *Jervis* v. *Smith*, Hoff. Chy. 470; *Lord* v. *Underdunck*, 1 Sand. Chy. 46; *Wolfe* v. *Frost*, 4 Sand. Chy. 72.

And again, specific performance of a void contract will not be decreed because of part performance, unless fraud and injustice would be done if the contract were held inoperative. *Purcell* v. *Miner*, 4 Wall. 513; *Williams* v. *Morris*, 95 U. S. 444. Such would not be the result here.

Nor can the receipt of rent in February, 1898, by Mrs. Patterson, under the circumstances detailed in the foregoing statement of facts, amount to such part performance of the invalid covenant to renew as to authorize its enforcement. Neither trustee received the rent. The signing of the name of Mr. Winslow, one of the trustees, on the back of the draft from the company in February, 1898, was without the knowledge of or authority from such trustee, although the endorsement was made in perfect good faith by Fisher & Co., and the money was paid to and received by Mrs. Patterson. That signing was not a part performance of the contract of lease on the part of the trustees or either of them.

Mr. Winslow was at this time absent in Nicarauga. There is no proof in the case that Mrs. Patterson knew there was no valid covenant in existence for the granting of a further five-year lease from August 1, 1897. Her receipt of the money as beneficiary under the will of her mother would not bind the trustees to renew a lease under an invalid covenant to do so, or operate as a part performance of that invalid covenant. Especially would this be so where, as in this case, there had for months, or ever since August 1, 1897, been a substantial refusal

by the trustees to renew on the old basis or to sell at the old price, and negotiations were still in progress between the trustees and the company relative to the terms of a continued occupation of the lands. The trustees and the company were alone the parties who could agree upon a lease, and while negotiations were pending on the subject, the receipt, unknown at the time to the trustees, of the money by Mrs. Patterson, as stated, could not be equivalent to a part performance by the trustees or either of them, of an alleged covenant to renew contained in the paper of 1892, the validity of which was at the same time denied.

Subsequently when drafts were received by the trustees they were not cashed, and when they were finally paid it was under a specific agreement that the payment should not in any way affect the situation between the parties. Hence the receipt of these drafts constituted no part performance upon which to base the recognition of the covenant to renew from August 1, 1897, which was repudiated as invalid by the trustees and which was in fact invalid.

Upon the question of the alleged contract to sell, after carefully examining all the facts, we agree with the Court of Appeals in holding that the company was not entitled to a decree for the specific performance of that alleged contract, and, therefore, specific relief of that nature should be denied. Under the terms of the will it is plain the trustees had no general and absolute power of sale, and the conditions upon which it could be exercised did not exist.

Regarding the other relief, we are of opinion that the portion of the injunction prohibiting the further prosecution of the trustees' action to recover the rental value of the land occupied by the company from August 1, 1897, up to the time mentioned in the complaint in that action, should be dissolved.

As to that part of the injunction which prohibits the further prosecution of the proceedings to recover the possession of the land there is more to be said. We agree with the Court of Appeals upon the subject of ousting the company from such possession. That court held that the evidence showed the company entered upon the use and occupation of the property

in controversy with a view to its purchase when it could properly be effected. It was understood by all the parties what the character of the use and occupation of the land by the company was intended to be. Subsequently to its obtaining possession of the land in 1872 the railroad company constructed what is known as its Metropolitan branch, part of a highway between Washington city, the adjoining States and the West. This highway is not a merely private enterprise nor a matter of purely private concern. It is a public road, constructed for public purposes, under the sanction of the public authority, and over which the public have rights which cannot be permitted to be obstructed, much less destroyed, either by the company itself, to which the franchise has been granted as a public trust to construct and operate this road, or by antagonistic parties claiming the ownership of the land upon which it has been permitted to enter without previous payment therefor, or as the result of any private controversy between the railroad company and such parties. The company having entered by the license of the lessors, an action at law for the dispossession of the railroad company cannot be maintained if the company is willing to make compensation for its use and occupation of the land.

These views of the Court of Appeals we concur in, but we do not say that the company can take proceedings in this suit to condemn the land. The proceeding to condemn is otherwise provided for by law, and although the appellants contend that the company has no power under the law to do so, we are of opinion that by virtue of the various acts passed relative to the company, it has such power in this city with reference to this land. The court ought to keep in force for a reasonable time, say six months, that portion of the injunction prohibiting the trustees from continuing their proceeding to dispossess the company from the land, in order to enable it to condemn such land in proper proceedings for that purpose, which cannot be taken in the present suit. If more time is needed, the trial court may upon application, after notice, extend the time as to it may seem reasonably necessary. If no proceedings to condemn are taken within six months from the issuing of the

mandate from this court to the court below, then the injunction should be wholly dissolved.

Our judgment, therefore, will be to reverse the judgment of the Court of Appeals of the District of Columbia, with directions to remand the case to the Supreme Court of the District, with directions to that court to refuse specific performance of the alleged contract to sell the land, and to deny enforcement of any alleged covenant to lease the same from August 1, 1897, and also to dissolve that portion of the injunction enjoining the trustees from prosecuting their suit to recover the rental value of the land from August 1, 1897, and to retain that portion which enjoins further action on the part of the trustees to oust the company from the land, for six months from the date of the mandate of this court, and for further time, if the Supreme Court of the District shall be of opinion that it is proper. If no proceedings are taken to condemn the land within six months, then the injunction shall be dissolved. When the condemnation proceedings are concluded, or if not taken within the time stated, then, at the end of that time, application may be made to the trial court, and such judgment then entered as shall be consistent with this opinion, and with such provision in regard to costs incurred, subsequent to the mandate from this court, as shall to that court seem proper.

*Reversed and remanded with directions to reverse the decree below and remand the case for further proceedings in conformity to this opinion.*