ROGER E. BROWER AND ALICIA L. BROWER, PLAINTIFFS, v. GLEN WILD LAKE COMPANY, A NEW JERSEY CORPORATION, DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided December 21, 1962.

*Mr. Israel B. Greene* for plaintiffs.

*Messrs. Levy, McCloskey, Schlesinger & Tischler* for defendant (*Mr. John J. McCloskey* and *Mr. Saul Tischler,* appearing).

HERBERT, J. S. C.  The defendant was organized in 1917 for the purpose of establishing a summer colony in Bloomingdale, Passaic County.  A tract of land was acquired, the pond area upon it was enlarged into a lake of approximately 111 acres, lots were laid out and a practice of leasing lots to

tenants was inaugurated. It was part of the plan that a tenant, rather than the defendant, would be responsible for putting up and maintaining buildings upon a leased lot. Down to the present time the basic scheme of leasing has been continued: residents at Glen Wild Lake still hold leases from the defendant, even though some of those residents have built valuable all-year homes in place of the simple "camps" which were contemplated when the colony was started.

The plaintiff Roger Brower became a tenant in 1936. The lease he signed was, in form, a booklet printed for the defendant's use. It was dated December 15, 1936 and provided for a term starting on that date and running until April 1, 1957. The rent was only $150 a year but the tenant was required to pay the taxes. Roger Brower and the plaintiff Alicia L. Brower married in 1942 and some time later her name was inserted in the lease to make her a cotenant. The premises let were lots 111A and 112, as shown on a map then on file in the defendant's office. Originally the building on these lots was a simple summer cottage. In recent years, however, the plaintiffs have constructed a valuable and attractive house which they occupy as their home through all four seasons of the year. The property has a lake frontage and, at the other end of the two lots, a frontage upon a private road.

The principal objective of the plaintiffs in this case is to obtain a perpetual renewal of the leasehold created by the lease of December 15, 1936. They contend that the lease as written calls for an infinite series of renewals and hence a perpetual term; or if that view of the language used be unacceptable, they say they are in any event entitled to a reformation of the 1936 lease which will give them the benefit of a clause for perpetual renewal.

The lease of December 15, 1936 contains, among other grants to the tenant, the following:

"5. The right to renew this lease for a further term of—Ten—years. Said renewal to be on a basis of not over 3⁵⁰ per Foot Lot Frontage in all other respects upon the same terms and conditions as are herein set forth, provided that notice of such renewal be given in

writing to the party of the first part at least three months before the expiration of the term thereof, and provided further, that the rental as agreed upon shall be paid in advance before the beginning of such renewal term."

After some initial dispute as to whether a timely and effective notice to renew had been given, the defendant offered the plaintiffs a renewal lease for a ten-year term commencing as of April 1, 1957, at a rental based on $3.50 for each foot of lake frontage; but the paragraph quoted above has been omitted from the offered lease and no other provision for a further renewal has been used in its place. In the light of the plaintiffs' aim to get a lease-hold in perpetuity, their unwillingness to accept the new lease proffered by the defendant would be expected, and they have not accepted it.

It is argued for the plaintiffs that a ten-year renewal which, in the words of the paragraph quoted above, is "in all other respects upon the same terms and conditions as are herein set forth," must include the same renewal clause. The argument is unsound. Vice-Chancellor Stevenson disposed of it in *Feigenspan v. Popowska*, 75 *N. J. Eq.* 342, 345 (*Ch.* 1909), where he said:

"This general covenant to renew, while calling for a lease of similar tenor to the original lease, does not require that the renewal lease shall contain a similar covenant to renew. The authorities all agree upon this exception, and the reason for it is obvious."

The vice chancellor did not go on to cite any of the authorities examined by him, but counsel for Glen Wild Lake Company have assembled a long list of pertinent ones, including *Winslow v. Baltimore & Ohio Railroad Co.*, 188 *U. S.* 646, 23 *S. Ct.* 443, 47 *L. Ed.* 635 (1903); 51 *C. J. S., Landlord & Tenant*, § 61, p. 605; 32 *Am. Jur., Landlord & Tenant*, § 968, p. 813; 1 *American Law of Property*, § 3.87, p. 369.

I find no language in the renewal clause which suggests that the parties, when making the lease, intended to run counter to the general rule of law and provide for a perpetual renewal or an unlimited series of renewals. A study of the

wording leads in the other direction. The lease does not call for a renewal "upon the same terms and conditions" as the original lease, but rather "in all other respects upon the same terms and conditions  *  *  *." What has been excluded by use of the phrase "in all other respects"? The proper answer seems to be, all of the language of the renewal clause which precedes that phrase; and that language, as will be seen by referring back to my full quotation of the clause, is: "The right to renew this lease for a further term of—Ten— years. Said renewal to be on a basis of not over $3^{50}$ per Foot Lot Frontage." If it were necessary to go beyond the strong line of authorities opposed to the plaintiffs' position, I would be persuaded that the parties themselves, by the language they used in the renewal clause of the 1936 lease, excluded from any second lease the right of a further renewal.

Turning to other arguments of the plaintiff for a perpetual leasehold to run from April 1, 1957, it may be noted that the major portion of a long trial was taken up by attempts to prove, and disprove, that the defendant by words and conduct had throughout most of its history assured tenants and prospective tenants that leases would be renewed indefinitely in favor of anyone who would pay his rent and be a well-behaved resident of Glen Wild Lake; and that assignees of unexpired leases would be approved as tenants almost automatically in spite of a clause limiting assignments to those approved in writing by the defendant.

The plaintiffs do not suggest that any other tenant has ever been granted a perpetual renewal by the defendant, or that any renewal lease for a stated term has ever repeated the same renewal clause found in the tenant's original lease. Up to now the tenants who have remained at Glen Wild Lake beyond the expiration date of their original leases have done so under renewal leases for a stated term. Though it might be expected that a plan launched in 1917, which involved the making of initial leases for approximately 20 years, would have produced by now a great many renewals of those leases, that is not so. Residents at Glen Wild Lake have come and

gone, and when a tenant found a buyer for his buildings (as all leases expressly permitted) and assigned his leasehold, it was the defendant's usual practice for many years to have the assignee sign a new lease, thus eliminating a literal renewal of the lease which such assignee had acquired from his predecessor. At the present time the defendant has about 160 tenants. The grand total of leases which have been in force at one time or another since 1917 is about 1,600. These figures are accurate enough to show the substantial amount of turnover. If each leasehold now existing had been held by the same tenant through an initial lease of 20 years and through or into a renewal term of ten years, there would obviously have been far fewer than 1,600 leases during the corporate life of the defendant; and this conclusion is emphasized when allowance is made for the years needed by the defendant to build up to the full present level of 160 tenants.

I wish to avoid creating any impression that the defendant's practices were uniform. For example, not all leases were in the form used for the Brower lease of 1936. The defendant changed its forms from time to time, and most if not all of the changes were designed to make the leases more favorable to the landlord. Not all leases were for 20 years, nor did all renewal leases provide for an additional ten years at a rental of not more than $3.50 a foot. In recent years a 50-year lease has been offered to tenants who might wish to surrender the unexpired portion of a shorter term in exchange for long-term assurance at somewhat higher rentals; and some tenants have taken 50-year leases, although the Browers, of course, did not. Other departures from uniformity could be catalogued, but to do so would contribute uselessly to the length of this opinion.

Have the plaintiffs shown a basis for reforming the lease of December 15, 1936 to include a clause giving rights to perpetual renewal, and a clause giving the absolute right of assignment, or either of such clauses? I conclude that they have not done so. Roger Brower testified rather briefly about negotiating for his lease. He dealt with Dr. Coates, an old

friend who was a director and officer of the defendant. At that time his uncle, Mr. Havens, was the president of the defendant, and there was also some discussion with him. According to Brower, he was told by Coates that on "renewals" he would have to expect the rental to go up. They agreed upon a renewal period of ten years at the rate of not more than $3.50 a front foot. These terms were written into the printed lease in blanks provided for that purpose. At a later point in his direct examination Brower said that he was told he could stay as a tenant as long as he wanted if he complied with the lease, but he conceded that when it came to the actual signing of the lease there was no discussion at all about the renewal term. No one else testified about the making of the Brower lease in 1936. Both Coates and Havens died some time ago and left behind no records in the defendant's files which the plaintiffs could refer to in aid of their case.

The plaintiffs have not proved, as a basis for reformation, that a mistake occurred or a fraud was perpetrated in December 1936 when the lease was executed. That would be so even if the serious question of laches could be ignored (*Ward v. Jersey Central Power & Light Co.*, 136 *N. J. Eq.* 181, 183 (*Ch.* 1945); *Smock v. Atlantic Casualty Ins. Co.*, 25 *N. J. Super.* 324, 329 (*App. Div.* 1953); *Auciello v. Stauffer*, 58 *N. J. Super.* 522, 528–530 (*App. Div.* 1959)), and the reformation phase of this case could be considered as though it had been brought promptly after the date of the lease when all possible witnesses were alive, instead of 22 years later.

Not only does the reformation claim of the plaintiff fail for lack of proof, but I am satisfied from the evidence, and so find, that on December 15, 1936 Roger Brower became a tenant under a lease containing the renewal clause, assignment clause and other provisions which both he and the defendant intended it to contain. In this connection it may be noted that at some time after December, 1936, when Mr. Brower, for his own use, made a copy of the lease from the

defendant's records, he included a notation on the jacket in his own hand, "With 10 years renewal." The making of this notation, followed by a lack of protest of any sort in the next several years, is hardly the conduct of a man who has discovered something wrong which he thinks must be corrected.

I conclude that the plaintiffs are not entitled to reformation of the lease of December 15, 1936.

The subject of estoppel is still to be considered. It was towards that subject that most of the proofs, *pro* and *con,* were aimed. The plaintiffs take the position that, in reliance upon the defendant's assurances, policies and practices as to renewals and assignments, they have built with the defendant's knowledge and acquiescence their valuable home which could not be moved to another location if their tenancy comes to an end. They assert that their reliance puts the defendant in a position where it cannot question their claim to a perpetually renewable lease with an absolute right of assignment, or at least their right to be reimbursed for the value of improvements and an equitable lien to secure such reimbursement.

Because I have concluded that the doctrine of estoppel has no proper bearing upon the case which is actually before me, I am not going to try to describe—more than I have already —or evaluate the evidence which the parties have supplied in this area. The present suit is not an action by a tenant who has used up his original term plus his stated renewal term and who has been denied a further renewal. Nor is it the action of a tenant who seeks to assign his leasehold rights to a person who is financially responsible and has good character references but has been denied approval arbitrarily by the defendant. It is possible to conceive of such a case, but I see no reason to anticipate it; and I wish to make it clear that I am not now passing upon any such case.

The plaintiffs are entitled under the terms of the lease of December 15, 1936 to a ten-year renewal which will run until April 1, 1967. As already noted, they are being offered such a lease. Instead of accepting that, they now really seek to

anticipate troubles which they may or may not have in the future, and are attempting to use estoppel, not to defend their present rights, but affirmatively for the purpose of establishing rights beyond April 1, 1967.

It appears to be accurate to say that estoppel is a doctrine to be used in a way which is essentially defensive. In 3 *Pomeroy, Equity Jurisprudence* (*5th ed.*, 1941), § 802. the author speaks of the rationale of the doctrine as follows:

"Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed or been enforceable by other rules of the law, unless prevented by the estoppel, * * *."

*State v. U. S. Steel Corp.,* 22 *N. J.* 341, 358 (1956); *Thomas v. Camden Trust Co.,* 59 *N. J. Super.* 142 (*Law Div.* 1959). Assuming, for the sake of discussion only, that the plaintiffs have proved all elements of a factual base from which principles of estoppel, at the right time and place, might be asserted to their benefit, it would still be my conclusion that the doctrine is not available to them here and now. If the plaintiffs see fit to continue as residents at Glen Wild Lake until April 1, 1967, the record in this case would lead me to anticipate that they will be able to negotiate without difficulty a continuation of their tenancy for a reasonable term at a reasonable increase in rent; or that if they decide to leave Glen Wild Lake before 1967, the defendant, as it has for many outgoing lessees in the past, will accept as a tenant any person to whom they sell their house and who has reasonably satisfactory references. Should time prove me wrong in my anticipations for the future, the plaintiffs may have grounds for seeking equitable relief in such definite situation as then confronts them.

There is one additional point: the lease of December 15, 1936 provides that the ten-year renewal term "be on a basis of not over 3⁵⁰ per Foot Lot Frontage * * *." Is the rent to be calculated by lake frontage or road frontage? If lake frontage, the plaintiffs will pay somewhat more; if

road frontage, somewhat less. The rental provided for the initial 20-year term is of no help in this connection. It was fixed at the flat sum of $150 a year. There was conflicting testimony about the calculation of rent in other cases where a frontage formula was applicable, and no clear-cut pattern of practical interpretation emerges from the proofs. I conclude, therefore, that I should arrive at a construction of the language of the lease which will be in keeping with the logic of the situation and the probable intention of the parties. The "front foot" which is so often used in calculating land value is merely a standard of convenience. It is likely, however, that parties would choose a standard having a significant relationship to their particular valuation problem; and at Glen Wild Lake water frontage must be more important to a tenant than road frontage. A hundred feet on the road and ten feet on the lake would make for a mediocre lot, for which the rental should be considerably less than if the dimensions were reversed. My conclusion is that the lease of December 15, 1936 calls for a renewal term of ten years during which the rental should be calculated on the basis of the lake frontage of the leased premises, and I so construe it.

There will be a judgment in favor of the defendant and against the plaintiffs with costs. However, if counsel consider it necessary or desirable, the judgment may provide for the ten-year renewal lease commencing as of April 1, 1957 which the defendant has offered to the plaintiffs.