******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BROOK RUN DEVELOPMENT CORP. *v.*
KRISTINE NOON ET AL.
(AC 46873)

Elgo, Suarez and DiPentima, Js.

*Syllabus*

The defendant tenant appealed from the trial court's judgment for the plaintiff landlord in the plaintiff's summary process action. The defendant claimed, inter alia, that the court improperly concluded that her residential lease with the plaintiff had terminated because a specific provision of the lease agreement did not operate to automatically renew the lease. *Held*:

The trial court properly determined that the defendant's residential lease with the plaintiff had terminated, as the language of the lease was clear and unambiguous as a matter of law.

Argued September 17, 2024—officially released January 28, 2025

*Procedural History*

Summary process action, brought to the Superior Court in the judicial district of New Haven, Housing Session, where the plaintiff withdrew its complaint as to the defendant John Doe et al.; thereafter, the case was tried to the court, *Spader, J.*; judgment for the plaintiff, from which the named defendant appealed to this court. *Affirmed.*

*Richard F. Connors*, for the appellant (named defendant).

*David E. Dobin*, with whom was *Joshua Pedreira*, for the appellee (plaintiff).

*Opinion*

ELGO, J. In this summary process action, the defendant Kristine Noon appeals from the judgment of the trial court in favor of the plaintiff, Brook Run Development Corp.[1] On appeal, the defendant claims that the

---

[1] The original defendants in this case were Kristine Noon, her brother William Henninger, and John Doe and Jane Doe. The plaintiff withdrew the cause of action against John Doe and Jane Doe on July 5, 2023. Because Noon was the original leaseholder, and Henninger moved into the residence after the lease was signed, we refer to Noon as the defendant throughout this opinion.

court improperly concluded that her residential lease with the plaintiff had terminated because a specific provision of the lease did not operate to automatically renew the lease.[2] We affirm the judgment of the court.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. The plaintiff is the owner of real property located at 183 Bull Hill Lane, Unit 12, in West Haven (premises). On November 17, 2012, the plaintiff and the defendant entered into a residential lease agreement for the premises, at the amount of $1200 per month (lease). The original lease term was for two years, running through December 14, 2014. The typed lease, prepared by the plaintiff, defined certain terms used therein, noting that "the words 'we,' 'us,' and 'our' means the [l]andlord" and "[t]he words 'you' and 'yours' means the [t]enant." It also contained a handwritten provision labeled 10 (A) which read as follows: "This lease will automatical[l]y renew on every an[n]iversary for the term of one year unless a written [agreement] is signed by us, or you vacate the apartment when the lease ends." The final relevant portion of the lease was a holdover provision, paragraph 18, which read as follows: "If you continue to occupy the [a]partment with our consent after this lease ends, this lease will be on a monthly basis. In that case, either you or we can send a notice to the other and cancel lease at any time. All the other terms of this lease will still apply."

The defendant took possession of the premises and has remained there throughout the events relevant to this appeal. On September 19, 2021, the plaintiff sent the defendant a notice of lease nonrenewal. That notice informed the defendant that the lease would no longer

[2] Although the defendant presents six issues in her briefing to this court, they may be distilled to the question of whether the trial court properly interpreted the lease in concluding that the automatic renewal provision had terminated.

renew and that the plaintiff was providing "the required written notice to vacate the premises as stated in your current [l]ease." The defendant did not vacate. The plaintiff then commenced a summary process action (first action) against the defendant, alleging, inter alia, lapse of time, with return of service on April 9, 2022. The defendant filed an answer and a special defense pursuant to General Statutes § 47a-23c.[3] The first action concluded on May 26, 2022, when the court rendered a judgment of possession in favor of the defendant, who the court found had proved her special defense that she is entitled to the protections provided by § 47a-23c.

On December 27, 2022, the plaintiff sent the defendant a letter notifying her that it would be increasing her rent to $1300 per month, effective February 1, 2023. Since the inception of the lease in 2012, the defendant has continued to pay the same rental amount of $1200 per month without increase. This letter also apprised the defendant that a previous notice to quit from November, 2022, was "rescinded and no longer has any legal effect."[4] It went on to notify the defendant that "[t]his notice is to advise you that you are in violation of your lease and/or rental agreement and your obligations

[3] General Statutes § 47a-23c prohibits eviction of certain tenants with physical or mental disability except for good cause, which is defined in subdivision (b) (1). Although the court found, in the first action, that the term of the lease had terminated, the court also determined that, because the defendant is protected by statute, she could not be evicted for lapse of time.

[4] The November 17, 2022 notice to quit read, in substance, as follows: "I hereby give notice that you are to quit possession or occupancy of the premises described above and now occupied by you on or before November 27, 2022 for the following reasons:

"(1) Nonpayment of rent.

"(2) Although you previously had a right or privilege to occupy the premises, said right or privilege has terminated.

"Any payments tendered after service of this Notice shall be accepted as 'USE and OCCUPANCY' and NOT as rent. You may be evicted only if the landlord brings a judicial action against you and in said action you may present a defense." (Emphasis in original.)

under Connecticut law . . . .” The pretermination notice, provided pursuant to General Statutes § 47a-15, accused the defendant of nuisance causing conduct and claimed that the defendant owed the plaintiff $500 for “marshal and legal fees incurred to enforce your lease.” The letter contained the further proviso that, “[i]f these conditions are not corrected within the time frame indicated, your lease will terminate on the sixteenth day after you receive this letter.” On May 25, 2023, the plaintiff served another notice to quit upon the defendant, citing the violation of lease terms, nonpayment of rent, failure to remedy a nuisance, and refusal to agree to a fair and equitable rent increase. The defendant nevertheless retained possession of the premises at all relevant times and refused to vacate.

The plaintiff then commenced the present action on May 30, 2023. In its summary process complaint, the plaintiff alleged five counts: (1) nonpayment of rent; (2) refusal to agree to a fair and equitable rent increase; (3) nuisance; (4) violation of the terms of the lease; and (5) right or privilege to occupy terminated. From the outset, the plaintiff argued that, in the first action, the trial court held that the term of the lease had “in fact terminated.”[5] The plaintiff further noted that, since the inception of the lease in 2012, the defendant has continued to pay the same rental amount of $1200 “without increase.”

In her answer, the defendant claimed to have a “current lease” and, citing paragraph 10 (A) of the lease, asserted that it provides for automatic renewal. The

---

[5] The plaintiff attached to its complaint a copy of the original lease for the premises; the original notice of lease nonrenewal, dated September 19, 2021; the court’s order in the first action, dated May 26, 2022; the plaintiff’s December 27, 2022 pretermination notice to the defendant; the final notice to quit, dated May 25, 2023; the return of service documentation dated May 30, 2023; and a handwritten letter by the plaintiff to the defendant advising her that her brother must vacate the premises under the terms of the lease.

defendant subsequently filed an amended answer and special defenses, in which she claimed, inter alia, that the lease had renewed at the current rent of $1200 per month and that the plaintiff's claim that there was a termination of right or privilege to occupy the premises "must fail" due to principles of res judicata. The defendant argued that the court, in resolving the first action, had found that a valid lease existed between the parties. In its reply, the plaintiff generally denied those special defenses.

A one day trial followed. The plaintiff called Robert Lanziero,[6] who had drafted the lease and testified with respect to the automatic renewal provision set forth in paragraph 10 (A). Lanziero testified that he had handwritten the provision and that the defendant had never agreed to terminate the lease. Lanziero further testified that the lease allows the lessor to "preclude the lease from renewing an additional year." Finally, Lanziero testified that the defendant had been leasing the premises for eleven years and that she continues to pay the original $1200 rent, having refused to pay the rent increase. The court also heard testimony from the defendant's neighbor and the defendant.

In its memorandum of decision, the court noted, with respect to the first action, that the lease had terminated but that the defendant qualified as a protected tenant under § 47a-23c.[7] The court also found that the defendant continued to pay $1200 per month to the plaintiff (rather than the increased rent of $1300) and that she

---

[6] At all relevant times, Lanziero was the sole owner of the plaintiff corporation.

[7] As the defendant acknowledges in her briefing to this court, the May 26, 2022 decision of the court in the first action found that the "term of the rental agreement terminated." The court also found that the plaintiff had proven by a fair preponderance of the evidence that the service of the notice to quit, the termination date and service of the complaint "were all timely and made according to the relevant law." The court dismissed four counts of the complaint but found in favor of the plaintiff on the lapse of time claim.

had not vacated upon receiving notice to quit. The court agreed with the plaintiff that paragraph 10 (A) of the lease provides that, "unless the [plaintiff] takes an action for nonrenewal, the lease would renew under its terms." The court also found that the September 19, 2021 letter provided notice to the defendant that the lease would no longer automatically renew.

The court further found that the lease contained a "holdover" provision that covered the circumstance of a tenant who remains on the premises after the expiration of the lease, converting the tenancy to a month-to-month tenancy. The court concluded that, "if no action is taken to the contrary, the terms of the lease are assumed to be the terms from the prior month especially as to the monthly rental amount. If the parties do *not* agree on the rental amount, there is no agreement for that month's tenancy between the parties. The plaintiff offered a new month-to-month rental at $1300 per month by letter dated December 27, 2022, and the defendant did *not* accept the new lease term and only continued to pay $1200 per month as use and occupancy. Accordingly, the defendant has *not* accepted a new month-to-month lease and has become a tenant at sufferance." (Emphasis in original.)

The court noted that the defendant, as a protected tenant under § 47a-23c, could not be evicted in the absence of "good cause," even as a tenant at sufferance. The court accordingly concluded that the defendant's failure to pay a fair rent increase constitutes good cause, citing our Supreme Court's ruling in *O'Brien Properties, Inc.* v. *Rodriguez*, 215 Conn. 367, 576 A.2d 469 (1990).[8]

---

[8] In *O'Brien Properties, Inc.*, our Supreme Court concluded, in relevant part, that "a landlord could still exercise his right to 'good cause' eviction against a tenant at sufferance under § 47a-23c (b) (1) (B), simply by offering the tenant at sufferance a rental agreement at a fair and equitable rent. Thereafter, if the tenant at sufferance refused to accept the rental agreement, the landlord's recourse to 'good cause' eviction would be appropriate." *O'Brien Properties, Inc.* v. *Rodriguez*, supra, 215 Conn. 374.

The court therefore rendered judgment in favor of the plaintiff, and this appeal followed.

On appeal, the defendant claims that the court improperly determined that her residential lease with the plaintiff had terminated. She contends, as a matter of contract interpretation, that the lease automatically renewed due to the ambiguous language of paragraph 10 (A). More specifically, the defendant claims, as she did in the first action, that the language of paragraph 10 (A) of the lease is "unequivocally ambiguous" and should therefore be construed against the drafter (the plaintiff), thereby locking the plaintiff and the defendant in a never-ending lease at a fixed monthly rent of $1200 unless and until both parties agree to terminate the lease. The plaintiff counters that the court correctly determined that the lease had terminated because paragraph 10 (A) clearly and unambiguously provides the plaintiff the right to terminate the lease and that the plaintiff did just that in its September 19, 2021 notice of lease nonrenewal.[9] We agree with the plaintiff.

We begin by noting that, "[a]s a contract, a lease is subject to the same rules of construction as other contracts." *Middlesex Mutual Assurance Co.* v. *Vaszil*, 279 Conn. 28, 35, 900 A.2d 513 (2006). "In construing a written lease . . . three elementary principles must be kept constantly in mind: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances

[9] As an alternative ground for affirmance, the plaintiff argues that the doctrine of collateral estoppel bars the defendant's claim that the lease was not terminated. The defendant disagrees, arguing that the first action does not bar this issue from being relitigated because whether the lease had terminated was not "essential to the decision in th[at] case" because the court found for the defendant, holding that she could not be evicted for lapse of time due to her protected status under § 47a-23c. In light of our resolution of the merits of the claim advanced by the defendant, we do not reach that alternative ground.

surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible. . . . A determination of contractual intent ordinarily presents a question of fact for the ultimate fact finder, although where the language is clear and unambiguous, it becomes a question of law for the court." (Internal quotation marks omitted.) *Cohen* v. *Postal Holdings, LLC*, 199 Conn. App. 312, 323, 235 A.3d 674, cert. denied, 335 Conn. 969, 240 A.3d 285 (2020); see also *Raczkowski* v. *McFarlane*, 195 Conn. App. 402, 409, 225 A.3d 305 (2020) ("when a contract is unambiguous within its four corners . . . the interpretation of it is a question of law for this court").

The question, then, is whether paragraph 10 (A) is ambiguous. "[T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]. . . . Where the language of the [writing] is clear and unambiguous, the [writing] is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a [written instrument] must emanate from the language used in the [writing] rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Rehab Associates*, 300 Conn. 314, 319, 12 A.3d 995 (2011). Further, "in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a

provision superfluous. . . . Therefore, [w]hen interpreting a contract, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." (Internal quotation marks omitted.) Id., 322. "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Poole* v. *Waterbury*, 266 Conn. 68, 88, 831 A.2d 211 (2003). Where a term is used interchangeably throughout an agreement, though, such that two plausible interpretations are possible, such a term will be construed as ambiguous. See *Isham* v. *Isham*, 292 Conn. 170, 184, 972 A.2d 228 (2009). "The individual clauses of a contract, however, cannot be construed by taking them out of context and giving them an interpretation apart from the contract of which they are a part." *Levine* v. *Advest, Inc.*, 244 Conn. 732, 753, 714 A.2d 649 (1998).

We note that the defendant effectively asks us to construe the language of paragraph 10 (A) so as to grant a right to perpetual renewal of the lease, in the absence of the agreement of both parties to terminate the lease. "[T]he right to perpetual renewal of a lease is not forbidden by the law . . . . Courts do not favor perpetual leases, however; thus a provision in a lease will not be construed as conferring a right to a perpetual renewal unless the language is so plain as to admit of no doubt of the purpose to provide for perpetual renewal." (Citations omitted; internal quotation marks omitted.) *Lonergan* v. *Connecticut Food Store, Inc.*, 168 Conn. 122, 124–25, 357 A.2d 910 (1975).[10] Our Supreme Court, in

[10] As our Supreme Court noted, there are certain key phrases and words that clearly signal an intent to create a perpetually renewing lease, such as "forever, for all time, and in perpetuity, words whose presence or absence in a lease is of considerable significance to a court in deciding whether a right of perpetual renewal was intended by the parties." (Internal quotation marks omitted.) *Lonergan* v. *Connecticut Food Store, Inc.*, supra, 168 Conn.

*Lonergan*, interpreting a renewal clause within the framework of a lease that had no rent escalation clause, noted that the absence of any rent escalation clause lent support to the notion that the renewal clause at issue in that case did not give rise to a self-perpetuating, never-ending right to occupy the premises. Id., 127–28.

Our careful review of the lease compels us to conclude that it is unambiguous as a matter of law. As previously noted, paragraph 10 (A) of the lease provides: "This lease will automatical[l]y renew on every an[n]iversary for the term of one year unless a written [agreement] is signed by *us*, or you vacate the apartment when the lease ends." (Emphasis added.) The terms "we" and "us" are defined in the lease as referring to the plaintiff. This usage is consistent throughout the lease. For example, paragraph 2 reads: "You will pay us total rent of $28,800.00. You will pay the total rent in monthly payments . . . . You will pay us a late charge of 5% for each payment that is . . . late. . . ." Paragraph 7 notes that "[w]e may enter the [a]partment at reasonable times . . . . We will give you reasonable notice of our intent to enter the [a]partment. . . ." Paragraph 9 states that, in the event that the building is condemned, "[i]f we decide to cancel the lease, we will give you notice within fifteen (15) days after the date of the condemnation." Paragraph 22 provides that the lease "shall be binding upon you and us and our respective successors, heirs, executors and administrators."

Nevertheless, the defendant argues that "us" as used in paragraph 10 (A) of the lease refers to both parties

126; see also *Winslow* v. *Baltimore & Ohio Railroad Co.*, 188 U.S. 646, 655, 23 S. Ct. 443, 47 L. Ed. 635 (1903) ("[t]here must be some peculiar and plain language before it will be assumed that the parties intended to create [a perpetuity]"); *Leone* v. *Sharron*, Superior Court, judicial district of New London, Docket No. CV-15-5014867-S (October 22, 2015) (61 Conn. L. Rptr. 177, 177–78) (applying *Lonergan* to similar lease provision).

to the lease and not just the plaintiff because an "agreement" requires the assent of more than one party. According to the defendant, "[t]he ambiguity inherent in paragraph 10 (A) is in the [plaintiff's] linking the word 'us' which it chose to use as a definition term beyond its normal meaning with the word 'agreement' which by definition requires more than one actor to form." The defendant notes that, although the verb "agree" appears many times throughout the lease, the term "agreement" appears "but once" in paragraph 10 (A). Essentially, the defendant argues that, although one party can agree to something, it takes more than one party to form an agreement. Although there is some logic to the defendant's argument when considered in isolation, the result of this interpretation is unreasonable when taken in the context of the entire document.[11]

In effect, the defendant asks us to read paragraph 10 (A) independently of the other provisions of the lease, which we cannot do. We are not persuaded that the mere use of the word "agreement" in paragraph 10 (A) renders ambiguous terms defined by the lease. We reiterate that the terms "we" and "us" are not only defined in the lease, referring to the plaintiff, but consistently so throughout its provisions.

Likewise, the term "agree" is also used consistently throughout the lease. After defining "we" and "us" as the plaintiff, the lease states that, "[w]e agree to lease to you, and you agree to lease from us [the premises]. . . . You and we agree to the following [lease provisions] . . . ." In paragraph 6, the lease details which

---

[11] During cross-examination, the defendant admitted that the term "us" was defined in the lease to mean the plaintiff, but she suggested that the fact that paragraph 10 (A) is handwritten means that it is an "added clause" that alters the "original lease." To be clear, as the defendant acknowledged throughout these proceedings, there was a single typed "original" lease document that was signed by both parties in 2012, which contained the handwritten paragraph 10 (A) that has been the subject of dispute.

utilities the plaintiff has agreed to pay, and paragraph 7 then provides that the plaintiff may enter the premises at reasonable times for the purpose of making necessary repairs to "the utilities or services that we have agreed to supply."

The lease, including within paragraph 10 (A), also clearly and consistently delineates the respective responsibilities that have been agreed to by the plaintiff and the defendant, by referencing the former using the terms "we" and "us" and the latter by using the term "you." Therefore, although the lease itself is an agreement that requires the assent of both parties, paragraph 10 (A) establishes that the lease will automatically renew unless the plaintiff decides in writing not to renew the lease—or the defendant vacates the premises. Put differently, paragraph 10 (A) gives alternative mechanisms for each party to sever the relationship established by the lease, notwithstanding the use of the noun "agreement." Given the consistent usage of "us" and "agree" throughout the lease, the trial court's determination of paragraph 10 (A) as clear and unambiguous is correct.

Further, construed in terms of the entirety of the lease, the lack of a rent escalation provision further supports the conclusion that the parties did not intend to enter into a perpetual relationship with one another, over the objection of the other party, at the same rental rate for all time. Paragraph 18 clearly establishes that either party can give notice of termination to the other, once the tenancy has shifted to a monthly agreement. For purposes of terminating the automatic renewal provision at the end of the lease term, paragraph 10 (A) provides for either party to exercise that option by requiring the plaintiff to sign a writing and the defendant to simply vacate the premises. We note as well that we are reluctant to construe a contract in "such a way that it would lead to an absurd result." (Internal quotation

marks omitted.) *Noroton Heights Shopping Center, Inc.* v. *Phil's Grill, LLC,* 207 Conn. App. 211, 220, 262 A.3d 970, cert. denied, 339 Conn. 920, 262 A.3d 137 (2021). We cannot construe the lease to bind the plaintiff to the defendant unless the defendant agrees to allow the plaintiff not to renew the lease or she decides to vacate the premises upon the conclusion of a lease term. This interpretation would hand over to the defendant, and, by operation of paragraph 22, to her heirs and assigns, complete control over the plaintiff's property—an untenable result.

For all the foregoing reasons, we conclude that the language of the lease is clear and unambiguous as a matter of law and that the court properly determined that the defendant's lease with the plaintiff had terminated. The defendant's claim, therefore, fails.[12]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[12] In conclusory fashion, the defendant appears to challenge the court's determination that she was a tenant at sufferance. The defendant does not challenge the court's determination that, as a tenant at sufferance, her refusal to pay a fair and equitable rent increase constitutes good cause for eviction under §47a-23c. Instead, she simply relies on her primary claim that the lease did not terminate. Because we already have rejected this primary claim, and this secondary, conclusory claim is not otherwise adequately briefed, we do not address it.